No. 25-11097

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

V.

DERRICK LEE,
*Defendant-Appellant.*

On Direct Appeal from the United States District Court for the Northern District of Texas
Fort Worth Division

# APPELLANT'S BRIEF

JESSICA GRAF
JESSICA GRAF, PLLC
TX BAR NO. 24080615
11430 Quaker Ave
Ste 200 PMB 1027
Lubbock, TX 79424
806-370-8006
jessica@jessicagraflaw.com

*Counsel for Mr. Lee*

## CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made so that the Judges of this Court may evaluate possible disqualifications or recusal.

| | |
|---|---|
| **District Judge:** | The Honorable Mark Pittman |
| **Magistrate Judge:** | The Honorable Hal R. Ray, Jr.<br>The Honorable Jeffrey L. Cureton |
| **Appellant:** | Derrick Lee |
| **Defense Counsel:** | Jessica Graf (appeal)<br>Blake Ryan Burns<br>Nick Davis |
| **United States Attorney for the Northern District of Texas:** | Ryan Raybould |
| **Assistant U.S. Attorneys:** | Gail Hayworth<br>Matthew Robert Weybrecht<br>Justin C. Beck |

/s/ Jessica Graf

## STATEMENT REGARDING ORAL ARGUMENT

I request oral argument. This appeal raises two significant constitutional questions. The first is whether Lee's right to confrontation was violated when the government built its case around fraud conclusions made by AT&T employees who never testified. The second is whether the district court punished Lee for going to trial by announcing, on the record, that it categorically refuses to consider leniency for defendants who exercise their right to a jury trial. These are serious questions, and Lee respectfully submits that oral argument would help the Court resolve them.

## TABLE OF CONTENTS


Certificate of Interested Persons .......... ii

Statement Regarding Oral Argument .......... iii

Table of Contents .......... iv

Table of Authorities .......... vi

Statement of Jurisdiction .......... 1

Issues Presented For Review .......... 2

Statement of the Case .......... 3

I. The government's case rested on two unreliable cooperating witnesses and AT&T's internal fraud investigator. .......... 3

II. The district court refused to consider a downward variance because Lee exercised his right to trial. .......... 8

Summary of the Argument .......... 11

Argument .......... 13

I. The district court violated Lee's Sixth Amendment right to confrontation by admitting the AT&T internal investigator's fraud conclusions. .......... 13

A. Standard of Review .......... 13

B. The spreadsheets conveyed testimonial statements from declarants who did not testify .......... 13

C. The error was not harmless—it was the government's entire case. .......... 18

II. Lee's 87-month sentence resulted from an unconstitutional trial tax. ............ 19

A. Standard of Review ........................................................................ 20

B. The district court imposed an unconstitutional trial penalty when it categorically refused to consider a downward variance because Lee exercised his right to trial. ........................................................................ 20

1. The jury trial right is the cornerstone of our constitutional democracy. ........................................................................ 20

2. The district court's own words confirm that Lee's sentence was driven by his decision to go to trial. ................................................ 22

3. The sentence disparity between Lee and his non-cooperating co-conspirator corroborates what the district court's own words already prove. ........................................................................ 26

C. This Court should vacate Lee's sentence and remand for resentencing before a different district judge. ........................................ 27

Conclusion ........................................................................ 28

Certificate of Service ........................................................................ 29

Certificate of Compliance ........................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alleyne v. United States*,
570 U.S. 99 (2013) ........ 22

*Bordenkircher v. Hayes*,
434 U.S. 357 (1978) ........ 19, 22, 28

*Bullcoming v. New Mexico*,
564 U.S. 647 (2011) ........ 15, 17

*Crawford v. Washington*,
541 U.S. 36 (2004) ........ 13, 17

*Davis v. Washington*,
547 U.S. 813 (2006) ........ 14, 16, 17

*Duncan v. Louisiana*,
391 U.S. 145 (1968) ........ 21

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009) ........ 14

*Palmer v. Hoffman*,
318 U.S. 109 (1943) ........ 14

*Taylor v. Louisiana*,
419 U.S. 522 (1975) ........ 21

*Thomas v. United States*,
368 F.2d 941 (5th Cir. 1966) ........ 24

*United States v. Devine*,
934 F.2d 1325 (5th Cir. 1991) ........ 19, 22, 26, 27

*United States v. Duron-Caldera*,
737 F.3d 988 (5th Cir. 2013)............................................14, 18

*United States v. Gozes-Wagner*,
977 F.3d 323 (5th Cir. 2020)............................................20, 24

*United States v. Hernandez*,
894 F.3d 1104 (9th Cir. 2018)............................................25

*United States v. Hill*,
63 F.4th 335 (5th Cir. 2023)............................................16, 18

*United States v. Hill*,
80 F.4th 595 (5th Cir. 2023)............................................23

*United States v. Ismoila*,
100 F.3d 380 (5th Cir. 1996)............................................16

*United States v. Martinez-Rios*,
595 F.3d 581 (5th Cir. 2010)............................................17

*United States v. Morgan*,
505 F.3d 332 (5th Cir. 2007)............................................13

*United States v. Pleitez*,
876 F.3d 150 (5th Cir. 2017)............................................20

*United States v. Rodriguez-Martinez*,
480 F.3d 303 (5th Cir. 2007)............................................18

*United States v. Rogers*,
504 F.2d 1079 (5th Cir. 1974)............................................22

*United States v. Towns*,
718 F.3d 404 (5th Cir. 2013)............................................16

*United States v. Wyss*,
542 F. App'x 401 (5th Cir. 2013)............................................16

**Federal Statutes**

U.S. Const. amend. VI ........................................................................................ 13

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court entered its final judgment on September 18, 2025. (ROA.219). Lee filed a timely notice of appeal on September 23, 2025. (ROA.229).

## Issues Presented For Review

I. Did the district court violate Lee's Sixth Amendment right to confrontation by admitting spreadsheets and testimony that conveyed fraud conclusions by AT&T employees and customers who never testified—evidence the government then used as the centerpiece of its case against Lee?

II. Did the district court unconstitutionally penalize Lee for going to trial when it announced on the record that it never grants downward variances to defendants who exercise their right to a jury trial, denied Lee's variance request on that basis, and sentenced him to nearly double the prison term received by a non-cooperating co-conspirator whose only meaningful difference was that he pleaded guilty?

## STATEMENT OF THE CASE

Derrick Lee was an AT&T salesman—a top performer who earned an all-expenses-paid trip to Florida for his work. He was indicted on one count of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349, and one count of Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and (2). (ROA.12–17). He exercised his constitutional right to a jury trial and was convicted on both counts. For that choice, as the district court made clear, he paid a price.

### I. The government's case rested on two unreliable cooperating witnesses and AT&T's internal fraud investigator.

The government's theory was that Lee was a "plug"— an AT&T employee who helped outsiders open fraudulent accounts, receive new phones, and disappear, in exchange for under-the-table kickbacks. (ROA.283–85). AT&T permits customers to open an account and receive a new phone without paying up front; the phone is paid off in installments over the account contract period. (ROA.283). The scheme, as the government described it, involved recruiters who hired runners to enter AT&T stores with stolen identities, open accounts, and walk out with new devices that were later sold overseas. (ROA.284–85). The plugs were AT&T employees who processed the fraudulent accounts and were paid based on device sales. (ROA.285).

The government had no direct evidence that Lee was a plug. There were no

communications between Lee and any recruiter. There was no evidence that Lee received a single kickback payment. Instead, the government rested its case on two cooperating defendants—both of whom had every reason to implicate Lee—and an internal AT&T fraud investigator whose conclusions rested on spreadsheets, not firsthand knowledge.

Lee's defense was straightforward: he did not knowingly participate in fraud. When runners entered the store, they carried photo identification that matched and the IDs looked real. (ROA.379). More importantly, AT&T had fraud prevention measures in place that Lee followed every time. Employees were required to scan customer IDs into AT&T's sale system, called Opus, before opening any account. (ROA.496). Opus ran a credit check and if it detected potential fraud, it issued a red flag requiring the employee to call the fraud department. (ROA.497–98, ROA.517). If the fraud department cleared the customer, the employee was required to proceed with the sale. (ROA.499–501). Lee followed this protocol. AT&T's own system approved the accounts.

AT&T used high pressure tactics to drive employees to make sales. (ROA.513). Employees were criticized or fired for insufficient sales, trained to assume customers had good credit, and expected to rely on Opus to prevent fraud. (ROA.501–02, 513).

Lee did well under pressure. He was a top salesman and the company rewarded him for his performance. (ROA.492).

To make up for its lack of direct evidence against Lee, the government relied on the word of two cooperating defendants. Arsenio Maxey worked at the same south Arlington AT&T store as Lee. (ROA.304). Maxey couldn't give many details about Lee's alleged involvement in the conspiracy. In fact, he only described two events involving Lee. First, Maxey testified that when he was recruited as a plug, the recruiter told Maxey that someone else working in the store was already involved in the conspiracy. (ROA.320). The recruiter didn't name Lee but described someone with "designer shoes," that Maxey took to mean Lee. (ROA.320). Second, Maxey stated that he once talked to Lee about another employee involved in the conspiracy, Brittni Seatherton, and complained that she was doing too much fraud and would bring unwanted attention to the store. (ROA.330). He also complained to Lee that the recruiter took too long to pay. (ROA.328). Maxey offered no testimony that Lee ever agreed to participate in the conspiracy, received any payment, or did anything other than sell phones in a store where fraud was happening around him. Unlike Lee, Maxey was listed as a "plug" in a recruiter's phone. (ROA.337). When he testified, Maxey had already been sentenced to two months in jail and two years of supervised release.

(ROA.339). Maxey would never serve time in prison. (ROA.339).

Brittni Seatherton's testimony was even less reliable. Like Maxey, she claimed that her recruiter told her Lee was already involved in order to convince her to join the conspiracy. (ROA.358). Seatherton first testified that she never spoke to Maxey about the scheme but—after a break during trial—decided to "change [her] answer a little bit," claiming that Maxey told her he and Lee were concerned about the amount of fraud she was conducting. (ROA.370). She never told law enforcement this information before taking the stand. (ROA.386). She apparently did not talk to Lee during the time the two worked at the store, but she claimed that after they were arrested, Lee told her he would deny involvement in fraud and say he was following AT&T's protocol. (ROA.376). At the time she testified, Seatherton was out of custody and had not yet been sentenced.

Without much detail from Maxey and Seatherton, the government relied on a different star witness—Gabriel Daigle, AT&T's internal fraud investigator. Daigle testified that he identified five employees at the south Arlington store engaged in fraud, including Lee. (ROA.403). He introduced four exhibits: Exhibit 1 is an Excel spreadsheet that Daigle testified was obtained from AT&T's billing system. (ROA.406–07). The spreadsheet lists sales made by various employees, including

whether the sale was cancelled as fraudulent. Exhibit 2 is an Excel spreadsheet calculating "fraud rates" for multiple AT&T employees, including Maxey and Lee. (ROA.407). Daigle testified that he determined the fraud percentages by looking at the number of accounts that an employee activated that were legitimate in comparison to accounts that were "cancelled for fraud or later determined to be fraud." (ROA.425). Exhibit 3 is a spreadsheet that shows roaming records, or when phones sold by Lee, Seatherton, and Maxey were used overseas. (ROA.408). And Exhibit 4 is a PowerPoint presentation summarizing the spreadsheets. (ROA.414).

Daigle testified that the average fraud rate for a sales associate was between 3 and 15%, but Lee's was 58.39%—representing, he claimed, 167 victims and $600,000 in losses to AT&T. (ROA.428–30). But Daigle admitted that Lee did not actually sell $600,000 worth of devices. (ROA.430). The loss figure included accounts that Lee opened but on which other employees later sold devices, meaning Lee was held responsible for fraud committed by others after his involvement ended. (ROA.433). This same methodology was not applied to Maxey or Seatherton, whose loss calculations were limited to accounts they personally created.

To prove aggravated identity theft, the government called Alexis Smith, who testified that an AT&T account was opened in her name without her permission.

(ROA.299). She reported the account to AT&T's fraud department, which investigated for 90 days before cancelling the account. (ROA.299).

The jury convicted Lee on both counts.

## II. The district court refused to consider a downward variance because Lee exercised his right to trial.

Lee's sentencing guidelines range on Count 1 was 63 to 78 months, driven largely by Daigle's inflated loss calculation. PSR Addendum ¶¶ 25–35, 71. Count 3 required an additional consecutive 24-month term of imprisonment. PSR Addendum ¶ 71. Lee filed a Sentencing Memorandum requesting a downward variance or departure, pointing out that the loss amount was inflated by attributing to him devices sold by other employees on accounts he had opened, and that this method was not applied to his co-defendants. ECF Doc. 114 at 2–3.

Lee asked the court to consider the unwarranted sentencing disparity that would occur if it imposed a guideline sentence. ECF Doc. 114 at 4. The recruiter allegedly over Lee was sentenced to 48 months of imprisonment and $93,946.82 in restitution, Seatherton received a 5-month sentence and $136,998,98 in restitution, and Maxey received a 2-month sentence and $90,980.77 in restitution. ECF Doc. 114 at 4. Several others identified in Daigle's spreadsheets were never prosecuted at all. ECF Doc. 114 at 4.

At sentencing, Officer Eric Ball spoke on Lee's behalf. (ROA.658). Officer Ball, who had known Lee since Lee was in high school, told the court that Lee was always respectful, polite, and mature (ROA.658–59). Officer Ball pointed out that Lee is a hard worker, even becoming the top salesman at a car dealership while on pretrial release. (ROA.659). And Lee was expecting twins with his fiancée. (ROA.659). He asked the court to consider Lee's strengths and potential for growth. (ROA.660). The government chose not to speak at sentencing. (ROA.667).

The court's response to the variance request was blunt: "I have never granted a downward variance on an individual that's decided to go to trial, especially in a case like this where it's overwhelming evidence." (ROA.664–65). The court dismissed the sentencing disparity argument by noting that "all the other ones actually plead guilty," and added: "I felt that the evidence was pretty overwhelming at the trial. This is sort of the reasons why if you're pretty clear you're guilty beyond a reasonable doubt, it's probably not in your best interest, under our sentencing guidelines, to go to trial." (ROA.654). When pronouncing the 87-month sentence, the court cited the Section 3553(a) factors without explanation. (ROA.667–68).

The court's attitude toward Lee's exercise of his trial right did not begin at sentencing. Immediately following the verdict, the court ordered Lee into custody,

stating: "it is my policy if you go to trial in a case that I do take you in today. And that's not anything specific to you, that's my policy across the board. Now, should you … like to challenge your detention following the verdict, you're free to file whatever you'd like to file; but that is my policy." (ROA.619–20). Lee did just that, and the magistrate allowed him to remain on conditions of release. (ROA.8). Apparently displeased, the district court instructed the prosecutors, "if this ever happens again where a magistrate releases a defendant post-trial, I want you to appeal it to me. You don't go to trial over here and get to walk out." (ROA.671).

This appeal follows.

## SUMMARY OF THE ARGUMENT

**First**, Lee was convicted on evidence the Confrontation Clause prohibits. The government's case rested on a 58.39% fraud rate that Gabriel Daigle, AT&T's internal investigator, presented to the jury as established fact. But Daigle did not determine that fraud occurred. He assembled spreadsheets from the conclusions of AT&T employees and customers who reported fraud, investigated transactions, and decided that specific accounts were fraudulent—none of whom ever took the stand. These were not neutral business records kept in the ordinary course of AT&T's operations. They were litigation products: compiled after the investigation began, derived from human judgments about criminal conduct, and created solely to prove Lee's guilt to a jury. The fraud rate was the government's answer to Lee's entire defense: that he followed AT&T's own protocols, that the IDs looked legitimate, and that he had no reason to know the transactions were fraudulent. The jury evaluated that defense under a number Lee could never challenge. That is not a harmless error.

**Second**, the district court imposed an unconstitutional trial penalty at sentencing. The district court imposed 87 months after announcing, on the record, that it has never granted a downward variance to a defendant who went to trial. That statement was the court's direct response to Lee's variance request, delivered at the

moment of sentencing, and it reflected a consistent philosophy the court applied from the moment the verdict was read. Immediately after the jury convicted, the court announced its blanket policy of detaining every trial defendant. When a magistrate judge released Lee on bond pending sentencing, the court admonished prosecutors to appeal any such release in the future, declaring: "You don't go to trial over here and get to walk out." The disparity between Lee's 87-month sentence and the 48-month sentence received by the non-cooperating recruiter above him in the conspiracy—explained by the court itself as the product of the others having pleaded guilty—confirms what the court's own words already established. Re-sentencing before a different judge is required.

## ARGUMENT

### I. The district court violated Lee's Sixth Amendment right to confrontation by admitting the AT&T internal investigator's fraud conclusions.

#### A. Standard of Review

This Court reviews an alleged Confrontation Clause violation de novo, subject to harmless-error review. *United States v. Morgan*, 505 F.3d 332, 338 (5th Cir. 2007). Lee preserved error by objecting below. (ROA.410, 414).

#### B. The spreadsheets conveyed testimonial statements from declarants who did not testify.

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. That right is violated where the prosecution introduces testimonial statements from a witness who did not appear at trial unless the witness was unavailable and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). Testimonial statements include those made under circumstances that would lead an objective witness to reasonably believe the statement would be available for use at a later trial. *Id.* at 51–52.

Business records ordinarily fall outside the Confrontation Clause because they are created to administer an entity's affairs, not to prove facts in a criminal

prosecution. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). But that exception has a hard limit: it does not apply when "the regularly conducted business activity is the production of evidence for use at trial." *Id.* at 321; *see also United States v. Duron-Caldera*, 737 F.3d 988, 994 (5th Cir. 2013) ("The standard for admissibility of business records … is not the same standard for determining the testimonial nature of statements under the Confrontation Clause.").

That is precisely what happened here. The government dressed up litigation products as business records and used them to place a 58.39% fraud rate before the jury without giving Lee the opportunity to cross-examine the people who came up with that number. To qualify as testimonial, a statement must have a "primary purpose" of "establishing or proving past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006) (cleaned up). Daigle himself made this clear. He testified that the Exhibit 1 contained "information from our billing system that was part of my investigation" into the fraud and described it as a "working product through the course of the investigation." (ROA.406, 436); *see Palmer v. Hoffman*, 318 U.S. 109, 114 (1943) (holding that an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad's operations, it was "calculated for use

essentially in the court"). Exhibit 2 was worse still: it consisted of Daigle's personal formula for calculating fraud percentages based on data contained in Exhibit 1. (ROA.425, 432). AT&T does not ordinarily track employee-specific fraud-percentage rates. Daigle invented that metric for the jury. And Exhibit 4 was a PowerPoint presentation created by Daigle specifically to summarize the other exhibits for the jury at trial. (ROA.414). Three exhibits, each created in the shadow of this prosecution, and not one of the declarants whose conclusions drove the numbers was subject to cross-examination.

The government will likely respond that the information contained on the spreadsheets merely stemmed from routine business records. After all, the billing system has a category for fraud status that is "computer generated, not even human." (ROA.407). That argument misses the point. The billing system's fraud-status field did not populate itself. A person reported fraud to AT&T and AT&T employees investigated and concluded that fraud occurred. (ROA.299). As the Supreme Court made clear in *Bullcoming v. New Mexico*, a non-testifying analyst "certified to more than a machine-generated number," and the defendant's right to confront that analyst cannot be satisfied by calling a surrogate. 564 U.S. 647, 660 (2011). The same principle applies here. The fraud conclusions embedded in the spreadsheets were

human judgments—judgments that a reasonable person would know were made to "establish or prove past events potentially relevant to later criminal prosecution." *See Davis*, 547 U.S. at 822; *United States v. Hill*, 63 F.4th 335, 357 (5th Cir. 2023) ("Key differences exist between test reports generated by a person's analysis and test reports which are the result of machine analysis.").

This case is nothing like the records this Court has found non-testimonial. Sprint's IP address logs in *United States v. Wyss*, 542 F. App'x 401, 405 (5th Cir. 2013), and the pharmacy purchase logs in *United States v. Towns*, 718 F.3d 404, 411 (5th Cir. 2013), existed independently of any prosecution. They were kept for billing and regulatory compliance. Daigle's derived statistics had no purpose outside the courtroom. *See United States v. Ismoila*, 100 F.3d 380, 391 (5th Cir. 1996) (holding that credit cardholders' statements reporting fraud to credit card company were not business records). Every exhibit here was created after the investigation began, by the investigator, for the jury.

Daigle was a surrogate for witnesses he could not replace—and that is exactly what the Confrontation Clause prohibits. Daigle did not determine fraud status himself. He could not explain the criteria AT&T employees used to classify accounts as fraudulent, and he acknowledged no potential error rates in those conclusions. He

simply took the findings of others as established fact and presented them to the jury as his own. *Bullcoming* forecloses that approach: a surrogate witness cannot "expose any lapses or lies on the certifying analyst's part," and substituting one witness for another does not cure the confrontation problem. 564 U.S. at 662. The spreadsheets did "precisely what a witness does on direct examination." *Davis*, 547 U.S. at 830. They told the jury that 58.39% of Lee's sales were conclusively fraudulent, and Lee had no way to challenge that conclusion because the people behind it never took the stand. (ROA.428–29); *see Hill*, 63 F.4th at 357 (distinguishing between reports generated by human analysis and those generated by machine).

Daigle's testimony and the spreadsheets were certainly offered to prove the truth of the matter asserted. *See Crawford*, 541 U.S. at 59 n.9. The government made sure of that. It hammered the fraud statistics in closing argument to prove that Lee knowingly participated in the scheme. (ROA.582–85, 610–12). The exhibits were not background detail—they were the government's answer to the central question the jury had to decide. *See United States v. Martinez-Rios*, 595 F.3d 581, 586 (5th Cir. 2010). The people whose conclusions produced those statistics were witnesses against Lee in every meaningful sense of the word. The Constitution required them to face cross-examination. They did not.

### C. The error was not harmless—it was the government's entire case.

A defendant deprived of the right to confront witnesses against him is entitled to a new trial unless the government proves beyond a reasonable doubt that there was no reasonable possibility the evidence contributed to the conviction. *United States v. Duron-Caldera*, 737 F.3d 988, 996 (5th Cir. 2013) (cleaned up). In assessing harmlessness, the Court considers the importance of the witness' testimony to the government's case, whether it was cumulative, the presence or absence of corroborating or contradicting evidence, the extent of cross-examination permitted, and the overall strength of the government's case. *United States v. Rodriguez-Martinez*, 480 F.3d 303, 308 (5th Cir. 2007). Each factor points in Lee's favor.

Daigle's testimony and the accompanying exhibits were the foundation of the government's case against Lee. Strip them away, and what remains is the testimony of two cooperating defendants who had every incentive to shift blame onto Lee, offering thin and largely secondhand accounts of his alleged involvement. Without Daigle, the government had no hard numbers, no fraud rates, and no quantitative hook for the jury to hang a guilty verdict on.

Daigle's statistics were the government's answer to the most important question in the case: did Lee know he was participating in a fraud? The fraud rate was decisive

precisely because Lee's defense was that he did not know the transactions were fraudulent—that he followed AT&T's own protocols, that the IDs looked legitimate, and that Opus approved every account. Daigle's 58.39% figure was the government's answer to that defense. Lee had no opportunity to cross-examine a single person who reported fraud against him, investigated a transaction, or concluded that any specific account was fraudulent.

The government cannot satisfy its burden of proving this error harmless beyond a reasonable doubt. The evidence that was wrongly admitted was the most important evidence at trial, it was not cumulative of anything else the government presented, and it went directly to the element the defense most seriously contested. There is, at minimum, a reasonable possibility that the jury's verdict rested on conclusions Lee could never challenge. He is entitled to a new trial.

## II. Lee's 87-month sentence resulted from an unconstitutional trial tax.

The Constitution forbids punishing a defendant for exercising the right to trial. "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978); *see also United States v. Devine*, 934 F.2d 1325, 1338 (5th Cir. 1991) (holding "a defendant cannot be punished by a more severe sentence because he unsuccessfully

exercises his constitutional right to stand trial"). The district court did not approach that line. It announced, on the record, that crossing it was its standing policy.

### A. Standard of Review

This Court reviews constitutional challenges and mixed questions of law and fact de novo. *United States v. Pleitez*, 876 F.3d 150, 157 (5th Cir. 2017). Lee preserved error by arguing below that it was unfair to sentence him more harshly than his pleading co-conspirators solely because he went to trial. ECF Doc. 114 at 4; *see United States v. Gozes-Wagner*, 977 F.3d 323, 335 n.7 (5th Cir. 2020).

### B. The district court imposed an unconstitutional trial penalty when it categorically refused to consider a downward variance because Lee exercised his right to trial.

#### 1. The jury trial right is the cornerstone of our constitutional democracy.

The Sixth Amendment's guarantee of a jury trial is not a procedural formality. It is a structural constraint on government power—the Founders' answer to a Crown that had weaponized criminal prosecution to punish dissent. The Declaration of Independence charged the Crown with "depriving us in many cases, of the benefits of Trial by Jury." The Sixth Amendment was the direct response.

Alexander Hamilton viewed the jury trial as the most valuable "defense against

the oppressions of an hereditary monarch."[1] Thomas Jefferson described trial by jury as "the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution."[2] These were not rhetorical flourishes. They reflected a founding generation that had lived under a system where the Crown could punish dissent through the machinery of criminal prosecution and had resolved never to tolerate it again.

The Supreme Court has consistently honored this original understanding. The jury trial right exists to "guard against the exercise of arbitrary power" by introducing "the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor." *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). It is an "inestimable safeguard against the corrupt or overzealous prosecutor." *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968). The "historical role of the jury" has been "as an intermediary between the State and criminal defendants." *Alleyne v. United States*, 570

---

[1] The Federalist No. 83, at 499 (Alexander Hamilton) (Clinton Rossiter ed., 1961), *available at* https://ia800102.us.archive.org/2/items/federalistpapers1961hami/federalist papers1961hami.pdf.

[2] Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), in 15 The Papers of Thomas Jefferson, at 267 (Julian P. Boyd ed., 1958), *available at* https://founders.archives.gov/documents/Jefferson/01-15-02-0259.

U.S. 99, 114 (2013).

That intermediary role is gutted when a defendant must choose between exercising his right to trial and his right to a fair sentence. Therefore, a defendant cannot be penalized for exercising his constitutional right to trial: "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.'" *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (citation omitted). This Court has explained that "if indeed [a defendant] 'paid a judicially imposed penalty for exercising his constitutionally guaranteed rights,' we are called upon to exercise our supervisory powers" and vacate the sentence. *United States v. Rogers*, 504 F.2d 1079, 1084 (5th Cir. 1974). "Rather than an unjustified incursion into the province of the sentencing judge, this latter responsibility [to provide careful scrutiny of the sentencing process] is, on the contrary, a necessary incident of what has always been appropriate appellate review of criminal cases." *Id.* at 1085; *Devine*, 934 F.2d at 1338.

**2. The district court's own words confirm that Lee's sentence was driven by his decision to go to trial.**

A defendant can show a trial penalty in two ways: (1) by comparison to the

sentences of "similarly situated" defendants who pleaded guilty, or (2) by the district court's "plain statement that it was punishing the defendant more severely than it otherwise would *because* she went to trial." *United States v. Hill*, 80 F.4th 595, 601 (5th Cir. 2023) (internal quotation omitted). While both apply here, this case does not require inference or comparison to co-conspirators to establish a constitutional violation. The district court said the quiet part out loud.

When defense counsel argued for a downward variance—supported by unrebutted character testimony and a compelling disparity argument—the district court cut off the argument and announced a categorical rule: "I have never granted a downward variance on an individual that's decided to go to trial, especially in a case like this where it's overwhelming evidence." (ROA.664–65). Read carefully, this statement is remarkable. The court did not say Lee's particular circumstances failed to justify a variance. It announced that an entire category of defendants—those who exercise their constitutional right to trial—are categorically ineligible for one. That is not the exercise of sentencing discretion. It is its abdication

The statement did not stand alone. It was part of a consistent sentencing philosophy the court applied at every stage of the proceedings. Immediately after the verdict, the court announced a blanket detention policy: "it is my policy if you go to

trial in a case that I do take you in today. And that's not anything specific to you, that's my policy across the board." (ROA.619–20). When a magistrate judge independently allowed Lee to remain on bond pending sentencing, the court was openly displeased, admonishing prosecutors at the sentencing hearing: "if this ever happens again where a magistrate releases a defendant post-trial, I want you to appeal it to me. You don't go to trial over here and get to walk out." (ROA.671).

That final statement is extraordinary. The court was not expressing concern about flight risk or danger to the community. It announced, in plain terms, that the act of going to trial is itself sufficient reason to be detained. The trial penalty was not confined to the sentencing decision. It was the court's operating principle from the moment the verdict was read.

This Court has squarely condemned such conduct. In *Gozes-Wagner*, this Court identified a district court's plain statement of a trial-based sentence as something that "clearly amounts to a constitutional violation." *Gozes-Wagner*, 977 F.3d at 337. In *Thomas v. United States*, 368 F.2d 941, 942 (5th Cir. 1966), this Court vacated a sentence where the district court tied a harsher outcome to the defendant's insistence on trial. The statements here are the explicit type this Court envisioned.

And courts beyond this Circuit have reached the same conclusion under similar

facts. In *United States v. Hernandez*, 894 F.3d 1104 (9th Cir. 2018), the Ninth Circuit vacated a sentence where the district court repeatedly emphasized the defendant's decision to go to trial during the sentencing hearing, ultimately declaring: "You decided to roll the dice, and it came up snake eyes. You wanted to go to trial, so you went to trial." *Id.* at 1111. The Ninth Circuit found those statements ran "headlong into" the constitutional prohibition that "a judge cannot rely upon the fact that a defendant refuses to plead guilty and insists on his right to trial as the basis for" imposing a harsher sentence. *Id.* at 1111–12. The Ninth Circuit particularly emphasized that the trial-focused comments "comprised virtually the entirety of the explanation for the sentence"—the court did not reference "any particular 'facts of this case' or 'particular record' beyond Hernandez's exercise of his constitutional rights." *Id.* at 1111.

The same is true here. When actually pronouncing Lee's 87-month sentence, the court cited the § 3553(a) factors but offered no explanation for why 87 months was the right number. (ROA.667–68.) It said nothing about Officer Ball's testimony. It said nothing about Lee's work ethic, his family, or his future. As in *Hernandez*, boilerplate recitation of the § 3553(a) factors immediately after announcing a categorical policy against trial defendants "does not cure the infirmities in the district

court's justification for the sentence imposed." 894 F.3d at 1111. The record here makes it "impossible to avoid the centrality of the comments about [the defendant's] decision to go to trial." *See id.*

**3. The sentence disparity between Lee and his non-cooperating co-conspirator corroborates what the district court's own words already prove.**

The district court's explicit statements alone are sufficient to establish the constitutional violation. But the disparity between Lee and his similarly situated co-conspirators provides powerful corroboration.

Not every co-conspirator is a valid benchmark. Seatherton and Maxey cooperated with the government and testified against Lee at trial. A defendant who cooperates is not similarly situated to one who does not, and the leniency they received reflects that cooperation—not merely their guilty pleas. *See Devine*, 934 F.2d at 1338–39. Their sentences therefore cannot, standing alone, establish a trial penalty.

The recruiter above Lee in the conspiracy presents a different picture. He was more culpable than Lee, as hhe recruited Lee into the scheme and was responsible for more devices. He did not cooperate with the government. He pleaded guilty and received 48 months—39 months less than Lee's 87-month sentence. The only thing Lee did differently was demand that the government prove its case to a jury.

While the charges and statutory exposure of the two may not be perfectly identical—the recruiter did not face an aggravated identity theft charge—the court's own reasoning makes the comparison apt. When dismissing Lee's disparity argument, the court noted that the others "actually plead guilty," identifying the guilty plea—not cooperation or any other distinguishing factor—as the operative difference. *See* (ROA.654). These are not the words of a court engaged in individualized sentencing. They are the words of a court enforcing a policy.

Where the only meaningful difference between a defendant who received 48 months and a defendant who received 87 months is that the latter went to trial, and the sentencing court identified that difference as the reason , the inference of a trial penalty is not merely reasonable. It is compelled. *Devine*, 934 F.2d at 1338.

### C. This Court should vacate Lee's sentence and remand for resentencing before a different district judge.

The district court's statements were not ambiguous references to trial proceedings offered in passing. They constituted an announced, standing policy—applied explicitly to Lee—of denying favorable sentencing treatment to defendants who exercise their Sixth Amendment right to trial. That is "a due process violation of the most basic sort." *Bordenkircher*, 434 U.S. at 363. The mitigation evidence Lee presented—unrebutted by the government, which chose not to speak at sentencing—

deserved genuine consideration. It never received it. Lee is entitled to a sentencing proceeding in which his mitigation evidence is considered on the merits, unconditioned by whether he chose to hold the government to its burden of proof.

## CONCLUSION

Derrick Lee respectfully asks this Court to reverse.

Respectfully submitted,

/s/Jessica Graf
JESSICA GRAF, PLLC
TX BAR NO. 24080615
11430 Quaker Ave
Ste 200 PMB 1027
Lubbock, TX 79424

## Certificate of Service

I certify that on February 27, 2026, I filed this brief electronically in the Court's ECF system. Opposing counsel has therefore been served pursuant to Fifth Circuit Rule 25.2.5. I further certify that: 1) any required privacy redactions have been made; 2) the electronic submission is an exact copy of the paper document; and 3) this document has been scanned for viruses by the following commercial virus scanning program: McAfee LiveSafe, and it is free of viruses.

/s/ Jessica Graf

## Certificate of Compliance

Pursuant to Rule 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned certifies this brief complies with the length limitation announced in Rule 32(a)(7)(B), because it contains 5,483 words

This brief complies with the typeface and type style requirements because it has been prepared in Microsoft Word using the proportionally spaced typeface Goudy Old Style, in a 14-point font size in the body of the brief, and a 12-point font size in the footnotes.

The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the length limitations in Federal Rule of Appellate Procedure 32(a)(7), may result in the Court striking the brief and imposing sanctions against the person signing the brief.

/s/ Jessica Graf